UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:13-CV-954-CRS

MICHAEL A. CANNON, *executor for and on behalf*
*of the* ESTATE OF CHRISTINE CANNON, DECEASED                    PLAINTIFF

v.

THE PNC FINANCIAL SERVICES GROUP, INC.
AND AFFILIATES LONG-TERM DISABILITY PLAN                    DEFENDANT

**MEMORANDUM OPINION**

Michael A. Cannon, executor for and on behalf of the Estate of Christine Cannon, seeks

to recover long-term disability benefits pursuant to Section 502(a)(1)(B) of the Employee

Retirement Income Security Act of 1974 after Liberty Life Assurance Company of Boston

("Liberty") denied Christine Cannon's ("Cannon") claim and appeal under The PNC Financial

Services Group, Inc. Long-Term Disability Plan (the "Plan").  Both sides moved for judgment on

the administrative record.  These motions require the Court to determine whether Liberty's

decisions were arbitrary and capricious.  For the reasons that follow, the Court finds that they

were not.  It will grant Liberty's motion, deny Cannon's, and dismiss this case with prejudice.

**I.        Procedural History**

The Plan provides qualified and eligible employees with long-term disability ("LTD")

benefits of sixty percent of their pre-disability compensation.  *See* AR 203.  To qualify for LTD

benefits for the first two years, a participant must prove that she is "Disabled," which is defined

as "unable to perform the material or essential duties of [her] own occupation as it is normally

performed in that national economy."  *Id.*  The Plan places a continuing responsibility on the

participant to submit proof that she is Disabled and receiving appropriate treatment under the

continued regular care of a licensed physician.  AR 211.   It provides that LTD benefits will stop

if the participant fails to provide proof that she is receiving appropriate treatment or complying

with a treatment plan.  *Id.*  Because Liberty and PNC entered into the Administrative Services

Only Agreement, Liberty had discretionary authority to interpret the terms of the Plan and

evaluate all questions of entitlement to LTD benefits under the Plan.  AR 215-17, 219-41.

      The PNC Financial Services Group, Inc. ("PNC") employed Cannon as an Investigations

Senior Analyst (or a check fraud investigator, as Cannon described it), a sedentary position that

required her to sit at a computer terminal for most of the day.  On October 25, 2012, she stopped

work to undergo a hysterectomy scheduled for the following day.  On December 31, after her

procedure and a few months of recovery, she returned to work.  But just a few days later—

January 3, 2013—Cannon again stopped work because of abdominal pain.  After this second

stoppage, she made a claim for LTD benefits under the Plan.  Liberty initially awarded her

benefits but later determined that Cannon was no longer Disabled.  Cannon appealed that

decision, but Liberty affirmed.  Then, Cannon brought this action.

## II.      Standard

      It is well-settled that "a denial of benefits challenged under § 1132(a)(1)(B) is to be

reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary

discretionary authority to determine eligibility for benefits or to construe the terms of the plan."

*Kalish v. Liberty Mut./Liberty Life Assurance Co. of Boston*, 419 F.3d 501, 505-06 (6th Cir.

2005) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).  "When such

authority is granted"—as here—"the highly deferential arbitrary and capricious review is

appropriate."  *Borda v. Hardy, Lewis, Pollard & Page, P.C.*, 138 F.3d 1062, 1065-66 (6th Cir.

1998) (quotations omitted).

Under the arbitrary and capricious standard, "[d]ecisions of the administrator or fiduciary must be upheld . . . if 'rational in light of the plan's provisions.'" *Id.* at 1066 (quoting *Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 983 (6th Cir. 1991)).  In other words, the administrator's "decision will not be deemed arbitrary and capricious so long as 'it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome.'" *Kalish*, 419 F.3d at 406 (quoting *Davis v. Ky. Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989)).  Notwithstanding this highly deferential standard of review, a reviewing court should not merely "rubber stamp a plan administrator's decision." *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 308 (6th Cir. 2010).

"Lastly, the Court notes that its review is limited to the administrative record." *Lewis v. Liberty Life Assurance Co. of Boston*, No. 3:12-cv-215-H, 2013 WL 2319349, at *4 (W.D. Ky. May 28, 2013) (citing *Schwalm*, 626 F.3d at 303 ("A court may consider only that evidence presented to the plan administrator at the time he or she determined the employee's eligibility in accordance with the plan's terms.")).

### III.    Administrative record review

To determine whether Liberty's decisions to deny LTD benefits and to deny Cannon's appeal were arbitrary and capricious, the Court will conduct a thorough review of the administrative record.  The administrative record in this case includes notes from communications between Cannon and Liberty, records from several physicians and a physical therapist, records from independent reviewers, and Liberty's conclusions.

### 1.    Liberty begins its investigation

Liberty began its investigation shortly after Cannon made her claim.  It conducted its initial interview on January 29, 2013.  AR 9.  In that interview, Cannon reported her

hysterectomy and said that it may have caused or worsened nerve damage that was causing abdominal pain. *Id.* She said the pain was so bad that she went to the hospital, and she also reported that sitting caused the worst pain. *Id.* She reported that she could stand for a while but needed to lie down for relief from the pain; she could type "and do everything except sit." *Id.* She reported taking daily pain medication. *Id.* And she told Liberty that her estimated return to work date was as soon as possible, but she had not set a firm date. *Id.* She also noted that she was seeing Dr. Horlander (OB/GYN), Dr. Jonathon Reinstine (OB/GYN), Dr. Ricky Collis (pain management), and Dunn Physical Therapy. *Id.*

The same day, Liberty sent Cannon a letter and several requests for information that it needed to process her claim. AR 18-27. The letter said that, under the terms of the Plan, Cannon had 45 days to provide proof of a disability. *Id.* at 18. Liberty also contacted Cannon's medical providers to request medical records from October 1, 2012, to the present. AR 28-47.

Meanwhile, the administrator of Cannon's claim for short-term disability benefits sent Liberty copies of Cannon's medical records from her recent visits with Dr. Horlander. AR 48-50. Cannon visited Dr. Horlander on January 2 and 7, 2013.

Dr. Horlander's notes from the January 2 visit report that Cannon suffered "sharp, constant pain" in her abdomen and pelvis; she also said that it "hurts to sit." AR 49. The notes said that Cannon's symptoms started the previous summer but that her pain had worsened in the past three weeks. *Id.* She reported that Vicodin helped, and Dr. Horlander noted that Cannon's gastrointestinal workup was negative. *Id.*

Cannon returned on January 7. Dr. Horlander's notes from that meeting show that Cannon again complained of severe abdominal pain. *Id.* Cannon reported that she had visited the emergency room on January 4 because of this pain. *Id.* Cannon complained of abdominal

pain mostly in her upper abdomen, pressure in her lower abdomen and pelvis, and vaginal pain when she sat. *Id.* She reported that she felt better at the time and better when she was resting but that her pain worsened over the course of the day. *Id.* When Dr. Horlander examined Cannon, she noted mild abdominal tenderness with deep palpitation. *Id.* Dr. Horlander also said that they discussed the other possible consequences of her pain—such as endometriosis, adhesions, or physical manifestations of stress (Cannon was very emotional at the meeting and stressed about caring for her father and about work). AR 50. Dr. Horlander did not think Cannon's situation was directly related to her hysterectomy or her "unremarkable" first 6-8 weeks of recovery; rather, Dr. Horlander believed it was a long-term issue. *Id.* Dr. Horlander said that she wrote Cannon a note to take "off work for a few days until further plan." *Id.*

Around the same time, Liberty received Cannon's records from Dunn Physical Therapy. These records show that Cannon visited four times. During her first visit, Cannon reported that she was unable to work her sedentary job and that her position of comfort was lying down and not moving. AR 76. The physical therapist found that the primary source of Cannon's symptoms appeared to be related to muscle spasms and tightness as well as hip and groin pain. AR 77. The therapist intended see Cannon twice per week for six weeks. *Id.* Cannon filled out a questionnaire and reported that she was "no longer able to work." AR 78. During the next few visits, Cannon continued to complain of pain. The therapist noted during one visit that Cannon was "in tears [over episodes of pain over [the] past few days" and in particular that sitting was painful. AR 83. The therapist also noted that Cannon had "significant restriction" in her abdomen and under her rib cage and that Cannon's symptoms were "resembling pudendal neuralgia." *Id.* In the final visit on the record, the therapist gave Cannon a transcutaneous electrical nerve stimulation ("TENS") unit and instructed on its use. *Id.* The therapist noted that

Cannon was progressing well, but that she needed to get some relief from the pain.  *Id.*  Though

Cannon had been directed to attend twelve physical therapy sessions, only four visits are in the

administrative record—the last of which occurred on January 29.  AR 84.

In early February, Liberty received LTD claim forms from Cannon.  AR 94-100.  In her

Activities Questionnaire, Cannon said that she could not sit, that she could stand "very little,"

and that she could walk "very little."  AR 96.  She said that she spent "most all day" in bed and

that she left the house only to drive to the doctor's office.  *Id.*  And she noted that she relied on

her family to run errands for her and clean the house.  AR 97.  When asked why should could not

engage in "any gainful employment," Cannon responded: "server [sic] pain—cannot function

physically during day/night.  Cannot sit, walk any length of time."  AR 98.  She did not include

an attending physician's statement.

Liberty also received records from Cannon's January visits with Dr. Jonathan Reinstine,

an OB/GYN.  AR 105-113.  In the first visit on January 9, Dr. Reinstine noted that Cannon was

anxious that she had a severe gynecologic problem.  AR 105.  The physical exam was "negative

except for subjective findings," and the labs and CT scan taken in the emergency room were

normal.  AR 105-07.  He prescribed pain medicine and asked her to return in a week.  AR 107.

In her next visit on January 14, Cannon told Dr. Reinstine that her pain improved with rest and

medicine.  AR 109.  Dr. Reinstine reported some "generalized tenderness" in her abdomen,

"caregiver stress," "abdominal pain," and "musculoskeletal pain."  AR 109-10.  He asked her to

continue her medication, referred her to physical therapy, and told her to come back in a month.

AR 110.  When she returned on January 24, many of her symptoms remained—she still

experienced abdominal and pelvic pain, and she was still anxious (though this improved).  AR

111-12.  Dr. Reinstine noted abdominal tenderness and guarding and ultimately recommended

that Cannon continue physical therapy and get a second opinion from a pain therapist.  AR 112.

### 2.       Liberty approves LTD benefits and continues its investigation

Having reviewed this information, Liberty found that Cannon was Disabled and approved

her for LTD benefits on February 15.  AR 121-22.  The letter noted that Cannon's claim would

be "evaluated periodically to determine ongoing disability," and it cautioned that "approval at

this time does not guarantee payments through the maximum benefit duration."  AR 21.  Her

benefits were awarded retroactively from January 31, 2013.  *Id.*

Liberty continued its investigation; it sent additional records requests to Dr. Ricky Collis

and Dr. Horlander.  AR 126-33.  Dr. Horlander never responded, but Dr. Collis did.  On March

4, Dr. Collis sent notes from three visits in January in February.  AR 134-38.  On January 30, Dr.

Collis noted that Cannon complained of abdominal and pelvic pain and that she had a

hysterectomy.  AR 134.  He noted that Cannon was "having a lot of spasming and tightness" that

was "really bothering her."  *Id.*  She "describe[d] the pain as a sharp pain which increase[d] with

sitting, standing, and walking."  *Id.*  He noted her medications and that her CT scan and

ultrasound were normal.  AR 135.  And after he examined her, he noted that her "abdomen and

pelvic region are diffusely tender to deep palpitation."  *Id.*  All other tests came back normal;

Collis's impression was that Cannon suffered from abdominal and pelvic pain with myofascial

muscle pain, and he also thought she had ADD.  *Id.*  He prescribed pain medication and muscle

relaxers and performed trigger point injections in the abdominal wall.  AR 136.  He advised her

to continue her treatment.  *Id.*  A week later (February 7), Cannon returned and said she was

feeling "about 20% better."  AR 137.  He noted again that her abdomen and pelvic region were

diffusely tender to deep palpitation and found that there was "spasming and tightness in the

muscles of the abdominal wall as well." *Id.* Again, he administered trigger point injections, and his diagnosis remained the same. *Id.* She returned two weeks later (February 21); Dr. Collis noted that Cannon was "still unable to work. The pain is severe in nature" and "is limiting what she can do and is affecting her quality of life and her ability to perform daily activities." AR 138. He said that the last trigger point injection did not help much and again noted that her abdomen and pelvic region were diffusely tender to deep palpitation. *Id.* His impressions from that visit were: "abdominal and pelvic pain, myofascial muscle pain, and neuralgia as well." *Id.* He prescribed a cream and directed her to otherwise continue her treatment plan. *Id.*

After Liberty had obtained these records, it forwarded Cannon's file to an OB/GYN for review. AR 5. Meanwhile, Cannon called Liberty to relay that she was only seeing Dr. Collis and another physician named Dr. McQuady. *Id.* She said that Dr. McQuady was scheduled to do an exploratory surgery for her abdominal pain on March 26. *Id.*

The day of the scheduled surgery, Liberty requested Cannon's treatment records from Dr. McQuady. AR 142-43. It also asked Cannon to submit any additional records to support her disability. *Id.* at 146. Only Dr. McQuady responded. On March 28, he provided records from a March 5 visit and the March 26 exploratory surgery. AR 147-59.

Dr. McQuady first saw Cannon on March 5, on Dr. Reinstine's referral. Dr. McQuady recited Cannon's medical history, including her hysterectomy, and noted the physicians she had seen. AR 151. He noted Cannon's pain while sitting and also noted the negative ultrasounds, CT scans, and colonoscopy. His exam revealed that Cannon was "extremely tender in the lower abdomen." AR 152. At the time, he noted four "impressions": (1) chronic pelvic pain syndrome; (2) past medical history of endometriosis; (3) pelvic floor muscle dysfunction; and (4) probably interstitial cystitis. *Id.* He administered bilateral pudendal blocks. *Id.* On March 26,

Dr. McQuady performed the scheduled cystoscopy and laparoscopy. AR 157. His preoperative diagnoses included: (1) pelvic pain; (2) possible interstitial cystitis; (3) intra-abdominal adhesions; and (4) pudendal neuralgia. *Id.* His postoperative diagnoses included: (1) pelvic abdominal pain; (2) intra-abdominal adhesions; (3) pudendal neuralgia; and (4) no evidence of interstitial cystitis. *Id.* Dr. McQuady removed adhesions and noted that Cannon "tolerated the procedures well." AR 157-59. Dr. McQuady instructed Cannon to take off work from March 26, 2013, through approximately April 23, 2013; he also noted that "[r]eturn to work will be further discussed at post-operative appointments." AR 150.

On April 1, Liberty received the report from its reviewing OB/GYN, Dr. Tracy Brennan. Dr. Brennan reviewed the records from Dr. McQuady, Dr. Reinstine, Dr. Collis, and Dr. Horlander. AR 161. She also reviewed Cannon's job description and physical therapy records. *Id.* After this, she noted that Dr. McQuady's surgery "would typically require a 2 week period with restrictions on heavy lifting of no greater than 10 to 20 lbs." AR 160. Dr. Brennan reviewed Cannon's records before concluding that Cannon's files "do not support a gynecologic etiology for [her] longstanding pelvic pain and therefore do not support restrictions and limitations based on a gynecologic diagnosis." *Id.* She concluded that "[a]ny further evaluation of restrictions and limitations based on her pain would best be assessed by a PM&R [physical medicine and rehabilitation] physician or a pain management specialist." AR 160.

The same day it received this report, Liberty sent Cannon's file to a PM&R specialist, Dr. Stuart Glassman. AR 162-64. Dr. Glassman submitted his report on April 9. AR 165-69. He reviewed Cannon's file and detailed symptoms and treatments. He noted that all tests were normal, that Cannon had diffuse tenderness on palpitation of the abdomen, and that Cannon had subjective pain complaints. *Id.* He concluded that there was "no clear etiology" and that Cannon

could work "at least light duty, lifting 20 pounds maximally, 10 pounds frequently, 8 hours a day, 5 days a week." AR 168. He said that Cannon should only occasionally bend, kneel, or squat, and that Cannon could occasionally drive. *Id.* These limitations, he concluded, "would be appropriate for the next two to four weeks as [Cannon] recovers from her recent surgery." *Id.*

After receiving this report, Liberty sent Cannon's file to Amanda Balkcom, a vocational case manager. AR 170-73. She reviewed Cannon's employment file and determined that her occupation was sedentary and required her to sit frequently. AR 173.

### 3.    Liberty denies LTD benefits

On April 15, Liberty informed Cannon that it had "determined that benefits are not payable beyond April 15, 2013." AR 182. That letter included the Plan's definition of "Disabled," listed and briefly summarized all of Cannon's medical records that it reviewed to make its decision (which included all of the records described above), and referred to Dr. Glassman's report. AR 182-83. Based on these records (and the classification of Cannon's job as sedentary), Liberty concluded that Cannon no longer met the Plan's definition of Disabled and said that she would not receive any benefits beyond April 15. AR 184.

### 4.    Liberty denies Cannon's appeal

On June 7, Cannon submitted her appeal. AR 185-89. In support, her attorney submitted a three-page letter, AR 186-88, along with a one-page letter drafted by Dr. McQuady, AR 189. The attorney letter begins by reciting the Plan's definition of "Disabled"; then, it argues that "considering the nature and extent of her primary work restriction (e.g. inability to sit without excruciating pain) caused by her objectively determinable and severe medical condition of pudendal neuralgia and pelvic floor muscle dysfunction, she cannot perform her essential work duties . . . ." AR 186-87. The letter attacked Dr. Glassman's findings—it said that Dr. Glassman

10

improperly ignored Dr. McQuady's clear etiological findings that Cannon suffered from pudendal neuralgia and pelvic floor dysfunction. AR 187. Because these conditions are associated with intense pain while sitting, it said, Cannon was incapable of performing a job that required her to sit all day. AR 187-88. The letter cited Dr. McQuady's diagnoses and letter. *Id.*

Dr. McQuady's letter was dated April 16—the day after Liberty denied Cannon benefits—and received by Liberty on June 14. AR 189. It was not a note from an office visit. In the letter, Dr. McQuady noted Cannon's medical history before concluding:

> She is unable to work. Her job requires that she be able to sit and patient has intense pain with sitting. She was diagnosed with pudendnal neuralgia as well as pelvic floor muscle dysfunction and these conditions are associated with pain with sitting and it is not possible for the patient to perform a job that requires that she sit. In addition, she has been noted to have coccydynia. She is being treated with pudendal nerve blocks and the area of the coccyx has been injected in [an] attempt to take the muscles out of spasm.

*Id.* And then, he listed his course of treatment and concluded: "I request that you reconsider her denial of disability and grant her short term disability." *Id.* Cannon submitted no other records.

Liberty denied the appeal on July 12. AR 191, 193-96. This letter again recited the Plan's definition of "Disabled" and included Plan limitations. AR 193-94. It said that "[u]nder the following conditions, LTD benefits may be less than expected, not paid at all, or stopped":

- You are no longer disabled, as defined by the Plan and determined by the claims administrator.
  . . .
- You fail to cooperate in the administration of your claim. Cooperation includes, but is not limited to:
  . . .
  - o  Providing proof of a continued disability or partial disability; and
  - o  Providing proof of continued regular treatment by a licensed physician
  . . .
- You refuse any appropriate, available treatment or fail to comply with your treatment plan. . . .

*Id.*  Then, it noted that Cannon's benefits were terminated on April 15 "as the updated medical information received and reviewed no longer supported that she was disabled . . . ." AR 194. Then, it considered and rejected Cannon's appeal.  Again, Liberty noted that Dr. Glassman concluded that Cannon had the capability to work as a check fraud investigator.  *Id.*  It described the OB/GYN review that found no gynecologic etiology for Cannon's pain and noted that Cannon's surgery with Dr. McQuady would only typically require a two week period of restrictions.  *Id.*  Next, Liberty considered Dr. McQuady's notes from March 28, where "Dr. McQuady's office filled out a form that she was instructed to be off from work effective March 26, 2013, through approximately April 23, 2014 [sic]."  *Id.*  And it acknowledged receipt of Dr. McQuady's April 16 letter but noted that "no further contemporaneous examination or treatment records have been provided to validate his assertions that Ms. Cannon remained restricted and limited such that she was unable to work."  *Id.*  Rather, the "most recent medical record on file" was the March 26 operative report.  Consequently, it concluded, "there is no further proof on file that she continued under the treatment of a physician and continued to comply with the treatment plan." AR 195.  In addition, it reviewed the vocational analysis—which noted that Cannon's occupation required "frequent sitting"—and the medical records to again determine that (as of April 15) Cannon was no longer Disabled as defined by the Plan.  *Id.*  For these two reasons, Liberty affirmed the denial of Cannon's LTD benefits.  *Id.*

## IV.    Liberty's decisions were not arbitrary and capricious

The Plan allowed Liberty to deny LTD benefits when Cannon was no longer (1) Disabled (as defined by the Plan and determined by the claims administrator) or (2) cooperating in the administration of her claim.  Because Liberty reasonably concluded that Cannon failed to

establish that she was Disabled and that she was cooperating in the administration of her claim, Liberty's decisions were not arbitrary and capricious.

### 1.      Cannon failed to establish Disability

In order to prove she was Disabled, Cannon had to show that she was "unable to perform the material or essential duties of [her] own occupation as it is normally performed in that national economy." AR 203.  Based on the evidence in the record on April 15, Liberty's determination that Cannon had not met this burden was rational in light of the Plan's provisions. Liberty's April 15 denial letter outlined all of the medical documentation in the record; it discussed notes from Dr. Horlander, Dunn Physical Therapy, Dr. Reinstine, Dr. Collis, and Dr. McQuady.  AR 182-83.  Liberty outlined Cannon's pain as she described it to each physician but also noted that every test result was normal.  It recognized that at the time, no physician told Liberty or Cannon that she was "unable to perform the material or essential duties" of being a check fraud investigator.  And it noted the report from Dr. Glassman's independent review, which determined that Cannon did "have a work capability."  AR 183.  So on April 15, Liberty had to consider one physician reporting that Cannon could work (Dr. Glassman), and none saying that she was unable to work (beyond the couple of weeks after her exploratory surgery with Dr. McQuady).  While every physician and Dunn Physical Therapy noted her pain, and Dr. McQuady wrote that Cannon suffered from pudendal neuralgia and pelvic floor muscle dysfunction, no one had said that Cannon was unable to sit at her desk for eight hours per day. Therefore, it was reasonable for Liberty to credit the report of Dr. Glassman and determine that Cannon was not Disabled a few weeks after her surgery.

The same is true of the record on appeal.  Though Liberty requested updated medical records, Cannon only submitted a letter from her attorney and a brief letter from Dr. McQuady.

The letter from Dr. McQuady was the first piece of evidence tying Cannon's medical condition to her ability to work.  Nevertheless, Liberty chose to credit the reports of Dr. Glassman and find that Cannon could work.  Given the circumstances, this was a reasonable decision.  Dr. McQuady's letter was dated April 16, 2015—one day after Liberty denied Cannon's LTD benefits and three weeks after he last saw her on March 26.  It was not accompanied by any additional medical evidence and was not written contemporaneously with any new examination. And at the end of the letter, Dr. McQuady asked Liberty to grant Cannon "short term disability." AR 189.  Because the medical evidence had not changed, Liberty acted reasonably in considering but ultimately rejecting the conclusions in Dr. McQuady's letter.

What of Cannon's argument that each physician noted that she suffered from abdominal or pelvic pain?  As the Sixth Circuit has repeatedly stated, "these types of subjective complaints are easy to make, but almost impossible to refute." *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 382 (6th Cir. 1996).  "In the absence of any definite anatomic explanation of plaintiff's symptoms, we cannot find that the administrator's decision was arbitrary and capricious." *Id.* The medical records at issue here do reflect that Cannon complained of pain, but none was able to connect that pain to an etiological cause that would render Cannon unable to work.  All of Cannon's medical tests in the record were normal.  Prior to Dr. McQuady's April 16 letter, the strongest evidence that Cannon had an anatomical condition that caused her pain was Dr. McQuady's March 25 note that Cannon had pudendal neuralgia.  But no one tied this condition to Cannon's inability to work beyond the few weeks it took her to recover from surgery.  Even Dr. McQuady's post-denial note (which was not accompanied by any additional medical information) only requested "short term disability."

14

Cannon's claim that Dr. McQuady had conclusively diagnosed her with pudendal neuralgia and pelvic floor dysfunction suffers the same fatal flaw. A medical diagnosis does not necessarily prove functional limitations. *See Rose v. Hartford Fin. Servs. Group, Inc.*, 268 F. App'x 444, 453-54 (6th Cir 2008). Here, even if the notations in the notes of Dr. Collis and Dr. McQuady did "conclusively establish" that Cannon suffered from pudendal neuralgia and pelvic floor muscle dysfunction (as Cannon claims), neither physician said that the conditions would prevent her from sitting. Again, no one said Cannon was unable to work beyond the time it would take her to recover from surgery. And the one physician who said Cannon could not work (the day after Liberty denied benefits) did so without any additional examination or medical information. Because none of Cannon's physicians connected Cannon's alleged conditions with her ability to work, and because Dr. Glassman and Liberty saw these records and decided Cannon could work, Liberty's decisions were not arbitrary and capricious.

What of Cannon's argument that Liberty's investigation was flawed because it failed to exercise its right to have Cannon undergo an independent medical review? The Plan allowed Liberty to conduct a physical examination, but it did not require one. This alone is not grounds for reversal; rather, it is "just one more factor to consider in [the Court's] overall assessment of whether Liberty acted in an arbitrary and capricious fashion." *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005). Here, because no one (other than Cannon) said that Cannon was unable to work beyond the time she needed to recover from surgery, Liberty found it unnecessary to conduct a physical examination in addition to its records review. Even in light of Dr. McQuady's one-paragraph letter on appeal, this decision was not arbitrary and capricious.

What of Cannon's reliance on *Calvert v. Firstar Finance, Inc.*? There, the plaintiff was diagnosed with lumbar spondylosis; multiple CT scans and the notes of the plaintiff's treating

15

physician reflected this.  *Id.* at 295-96.  The Court concluded that there was nothing "inherently objectionable about a file review by a qualified physician in the context of a benefits determination," but that the file review in that case was "clearly inadequate."  *Id.* at 296.  The reviewing physician's report failed to mention surgical reports, x-rays, and CT scans in the record; it failed to mention that the Social Security Administration had determined the plaintiff was disabled; it said that a functional limitation exam could be helpful (and failed to mention the already-completed functional limitation exam that concluded plaintiff suffered from some degree of functional limitation); and it made conclusions that were "incredible on their face."  *Id.* at 296-97.  Here, the review by Dr. Glassman summarizes all of the medical information in the administrative record, including the notes from Dr. McQuady.  *See, e.g.*, AR 167 ("Dr. McQuady felt she had chronic pelvic pain syndrome and endometriosis and pelvic floor muscle dysfunction.").  Though Dr. Glassman's report did not mention "pudendal neuralgia," it did describe some of the symptoms that Cannon now attributes to the condition.  *See, e.g.*, *id.* ("On physical examination, she was tender on the abdominal and pelvic region.").  Even without this reference, Dr. Glassman considered the relevant symptoms and considered how it would affect Cannon's ability to work.  Likewise, both of Liberty's denial letters to Cannon reference the visits with Dr. McQuady and reference the pain Cannon experienced at work and while sitting.  *See, e.g.*, AR 183 ("You were noted as having pelvic, rectal, abdominal, and back pain.").  Nonetheless, they weighed all the relevant information and found that Cannon was not Disabled.

### 2.        Cannon failed to prove that she complied with her treatment plan

Liberty had a second independent basis to deny Cannon LTD benefits:  She did not cooperate in the administration of her claim.  To cooperate in the administration of her claim

under the terms of the Plan, Cannon was required to prove continued regular treatment by a licensed physician and compliance with her treatment plan.

Cannon failed to meet this requirement for two reasons.  First, the last records of any medical treatment in the administrative record are from visits with Dr. McQuady on March 5 and March 26.  Nothing in record suggests she ever saw him again; and if she did, it was her burden to produce that evidence.  Liberty denied her claim on April 15, and denied her appeal on July 12.  Cannon submitted nothing to suggest she was under the care of any physician throughout this long period of time.  The second problem lies with Cannon's physical therapy records.  She was initially instructed to attend physical therapy twelve times—twice per week for six weeks.  But the record only reflects four visits over two weeks.  And the Dunn Physical Therapy notes from that short time suggest that Cannon was improving somewhat with her therapy.  So why did she stop?  Nothing in the administrative record answers the question.  Consequently, for these two reasons, it was reasonable for Liberty to conclude that Cannon was not receiving appropriate treatment under the continued regular care of a physician as required by the Plan.

### V.	Conclusion

In sum, Liberty's decision to deny Cannon's LTD benefits was neither arbitrary nor capricious.  Liberty's decision that Cannon failed to prove she was Disabled and under the regular continued care of a physician was reasonable under the terms of the Plan.  The Court will issue an order consistent with this Memorandum Opinion.

cc: Counsel of Record

17